COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JOSEPH VALENTINO JOINER, | § | No. 08-18-00118-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | |
| | § | 346th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC# 20150D02895) |
| | § | |

## **O P I N I O N**

A jury convicted Appellant Joseph Valentino Joiner of three counts of sexual assault of a child younger than 17 years of age.[1] The trial court assessed his punishment at 15-years' confinement for each count, with the sentences to be served consecutively, and sentenced him accordingly. Appellant raised three issues on appeal with all relating in some manner or form to the trial court's admission of extraneous-offense evidence alleging that Appellant had committed a sexual assault against another complaining witness nearly two years *after* the assault that was charged in this case. Appellant argues that the trial court committed reversible error by: (1)

---

[1] The indictment charged Appellant with penetrating the victim's sexual organ with his finger, penetrating her sexual organ with his sexual organ, and penetrating her anus with his sexual organ.

admitting evidence of an extraneous offense during the prosecution's case-in-chief over Appellant's objections; (2) curtailing Appellant's proposed cross-examination of an extraneous-offenses complainant on a specific topic; and (3) denying Appellant an opportunity to present closing argument asserting that—because the State had failed to prove the extraneous offense beyond a reasonable doubt—the jury could not consider the evidence at all. Appellant also asserts a cumulative-error argument within his three issues in which he argues that the error arising from the trial court's rulings should be viewed in cumulation to determine whether reversal is required here. Finding no error, we affirm.

## I. BACKGROUND

### A. The Outcry and Investigation

On December 23, 2014, at about 1:45 a.m., Angelica Lopez and her husband were asleep at their home when they were awakened by N.L.[2] knocking at their front door and ringing their doorbell. When they answered, N.L. pleaded for help and told the couple that she had been raped. N.L. was crying and shaking, and she appeared hysterical, with her hair messed up, and the neck of her blouse stretched out. To Angelica Lopez, N.L. appeared to be 14 to 15 years of age. The couple brought N.L. into their home and called both 911 and N.L.'s mother.

Soon afterwards, police and an ambulance arrived. Medical records from the El Paso Fire Department detailing interactions with N.L. were admitted at trial. N.L. reported to responders that she was raped at a nearby elementary school and walked to the Lopezes' home immediately afterwards. N.L. described that she met Appellant, her assailant, on Facebook and that he said he

---

[2] Because the complaining witness was a minor at the time of the offense, we will use the initials "N.L." throughout this opinion to protect the identity of the witness. *See* TEX. R. APP. P. 9.10(a)(3).

was 17-years' old. She complained of genital pain and said she was choked by Appellant while she was in the back of his car. While in the ambulance, N.L. spoke briefly to El Paso Police Department Officer Ashley Pagitt and told her that she had been raped in the parking lot of a nearby school. When Officer Pagitt first approached N.L. she was crying to the point that she was breathing heavily and having trouble speaking in complete sentences. Officer Pagitt described that N.L.'s hair was in a mess, her clothing was stretched out and not in place, and she looked disheveled as though she had been in a scuffle or an assault.

N.L. was taken to the El Paso Children's Hospital and arrived there at about 2:22 a.m. There, N.L. gave Officer Pagitt a much more detailed account of Appellant's sexual assault. N.L. told Officer Pagitt that Appellant had contacted her on Facebook and asked for her phone number. After N.L. gave him her number, Appellant began texting her with questions including asking her what bra size she wore and whether she wanted to meet. Initially, N.L. agreed to meet, but once the meeting time approached, she told Appellant that she no longer wanted to meet. Appellant reacted in anger saying, "Are you fucking serious?" So, at that point, N.L. described that she felt she was obligated to go because he was upset.

N.L. told Officer Pagitt that she then left her apartment and waited nearby until Appellant arrived in his car. Appellant drove to a school parking lot, parked, then began running his fingers up and down N.L.'s legs. Appellant then threw N.L. into the backseat of his car, held her down, and took off her pants. N.L. reported that she told Appellant, "No, stop. I don't want to have sex with you." But Appellant continued anyway. After her pants were off, N.L. reported that Appellant spit onto her vagina and inserted his fingers inside of her. She could not remember how many times he inserted his fingers, but at that point, she continued to yell for him to stop.

3

He then inserted his penis twice into her vagina before he flipped her over onto her stomach and inserted his penis into her anus four times. At that point, N.L. was able to open the backseat car door and scream out for help. But Appellant pulled N.L. back into the car by her hair, told her to "[s]top making a scene and just open your legs," then inserted his penis into N.L. once again. At some point during Appellant's assault, he held N.L. down and put his hands on her throat. Eventually, N.L. was able to escape and get outside the car, and Appellant threw her clothes at her but kept her phone and jewelry, telling her that he was not going to give them back. As N.L. ran away from his car, she looked back, read his license plate, and repeated it to herself "over and over" until she could find somebody to help her. She ran down the street knocking on doors until the Lopez couple invited her inside and called 911. N.L. told Officer Pagitt that she did not believe Appellant had worn a condom or that he had ejaculated during the assault.

After N.L. told Officer Pagitt about Appellant's sexual assault, N.L. underwent a physical examination performed by Hope Miller, a nurse who is trained as a Sexual Assault Nurse Examiner (SANE). The examination records were admitted into evidence and contained a narrative of N.L.'s "History of Assault" typed by Nurse Miller that recited N.L.'s description of Appellant's sexual assault. These records largely paralleled the account of events that N.L. gave to Officer Pagitt while adding additional detail. The records noted that when N.L. told Appellant he was hurting her, and when she kept trying to get up, Appellant responded by choking her with both hands and warned her to stop resisting or else he would punch her. The records also contained a diagram of N.L.'s injuries and showed that she had a red area on the right side of her neck where Appellant had been kissing her, a linear red area on the back of her left arm, and two small bruises on her right elbow. N.L. also reported she felt pain on the back and left side of her head, her left shoulder,

4

around both of her forearms, and on the front and back of both her thighs. She also had a torn bra. Although the records noted that N.L. had no visible external injuries to her genitalia, her perineum, or her anus, Nurse Miller explained that it is not uncommon for a sexual-assault victim to have no such injuries and that various factors can affect whether an injury will be present. Nurse Miller also testified that she would not expect to find evidence of semen where an assailant was not reported to have ejaculated.

At about 9 a.m. on the morning of December 23, El Paso Police Department Detective Roger Genera of the Crimes Against Children Unit was assigned to N.L.'s case along with his partner, Detective Mallory Jordan. The two detectives met with N.L. for an interview during which N.L. told them about Appellant's sexual assault, and the detectives also obtained statements from the Lopez couple and N.L.'s mother, as well. To Detective Genera, N.L. "looked her age" of 14-years' old. Later, the detectives checked to see if any cameras might have captured the offense at the school, but they were informed by school staff that no cameras faced the parking lot.

Although N.L. did not know Appellant's full name and had been blocked by him on Facebook, police were eventually able to take the license plate and description of Appellant's vehicle, a 2014 white four-door Chevy, as given by N.L., and trace it to Appellant who was confirmed to be 24-years' old. Detectives Genera and Jordan went to Appellant's apartment on the day after the offense, December 24, to ask him if he was willing to give a statement, and Appellant agreed to do so. The detectives and Appellant then went to the police headquarters to record Appellant's statement.

### B. Appellant's Video-Recorded Statement

Although Appellant was not yet in custody, Detective Genera testified that he advised him

of his constitutional rights before interviewing him to include his right against self-incrimination, his right to remain silent, his right to have an attorney present prior to and during questioning, his right to have an attorney appointed to advise him prior to and during questioning, and his right to end the interview at any time. After each right, he was asked if he understood and he said, "Yes." Detectives advised Appellant that he was a suspect in a sexual assault of a child case that was being investigated. Appellant agreed to waive his rights and speak with the detectives. Appellant's video-recorded statement was admitted as an exhibit and played for the jury.

Although Appellant first claimed that he was asleep on the Monday night of the offense and did not know anyone by N.L.'s name, he subsequently clarified that he was with a girl on "Sunday night" but never knew her name. Appellant claimed that the girl initially told him she was 18-years' old, and he picked her up at her apartment and parked at a school where the two began kissing and where he "started fingering her and all that stuff." She suggested they go to the backseat, but after she told him that she was only 13-years' old, Appellant got "pissed off" and kicked her out of his car. Appellant denied having sex with her, hitting her, or taking her phone. However, Appellant stated, "she did kick me though for no fucking reason." Appellant also later claimed that the reason they did not have sex was because he did not have any condoms, and even though he had been "trying to get it in," he stopped when she told him her age. Finally, Appellant assured the detectives that if he wanted to "rape a chick" he would simply grab them, keep them down, and make sure they passed out before raping them.

### C. N.L.'s Testimony

Then 17-years' old at the time of trial, N.L. testified that she was 14-years' old at the time of the offense. At that time, she was living at her sister's apartment and taking care of her one-

6

year-old niece. She was homeschooled and in the equivalent of seventh grade.

In the afternoon on the day of the incident, around 3 or 4 p.m., Appellant contacted her through Facebook messenger, and after some small talk, he asked for her phone number. N.L. obliged. N.L. testified that her family was strict, and due to both her homeschooling situation and her care of her niece, she was never allowed to go outside and had become lonely. When N.L. gave Appellant her phone number, he called right away, and they spoke for about three minutes during which Appellant told her that he was nude and touching himself. Appellant also claimed to be 16-years' old. N.L. did not respond to Appellant's sexual commentary and instead made an excuse that she needed to take care of her niece and got off the phone. Appellant repeatedly called her back and sent angry text messages asking why she was not answering him. Around 8 or 9 p.m., N.L. answered one of Appellant's calls. Although N.L. felt uneasy about meeting him and still undecided about whether she really wanted to do so, she gave him her address. However, when Appellant called her to say that he was going to stop at a Walmart first, she told him that she no longer wanted to meet. Appellant then threatened to go to N.L.'s apartment-complex the next day and tell N.L.'s sister that N.L. was a whore. This scared N.L. because she did not want to get in trouble with her sister.

When Appellant arrived at N.L.'s apartment-complex, he called her again, and N.L. told him that she could not meet him because her niece was crying for her. Appellant told N.L. that he would probably "whip the shit out of the kid" and that N.L. had better come outside. Because N.L. was afraid and did not want to get in trouble, she went outside to meet Appellant. Appellant pulled his car up to N.L., grabbed N.L. by her arm, and shoved her inside the car. As Appellant drove away, he told N.L. not to try anything because the doors were "child locked." Appellant pulled up

to a school that N.L. recognized as being one that her brother attended. After parking, Appellant proceeded to kiss her on her neck before throwing her to the backseat where he took her pants down. After looking at N.L.'s vaginal area and commenting that she appeared "tight" and that he was going to have "fun," Appellant spit on two of his fingers and penetrated N.L.'s vagina with them. Although this hurt N.L., Appellant proceeded to then penetrate her vagina with his penis and began thrusting for what "felt like forever." N.L. was able to grab the backseat door handle at one point, open the door, and scream for help. But Appellant pulled N.L. back inside, closed the door, banged N.L.'s head on the arm rest of the door, and choked N.L. with both hands – to the point that she thought she would die – until she was able to tell him she would be compliant if he did not kill her. Appellant then flipped N.L. onto her stomach and penetrated her anus.

Sometime during this ordeal, N.L. pleaded with Appellant to stop, kicked him in defense, and told him that she was only 13-years' old. N.L. testified that she did not remember if Appellant wore a condom and she did not know whether he ejaculated. Eventually, she described that Appellant suddenly stopped, looked around, then opened the car door and threw her out. He also threw her clothes out, but he kept her phone, telling her that she was a "smart bitch" and "would call the police." N.L. further testified that she tried to get back in the car as she hoped that Appellant would take her home. When asked why she would want him to take her home after what he had done, N.L. explained to the jury that she was not planning on telling anybody and she felt embarrassed. She was worried that her family would be upset and disappointed in her.

As Appellant drove away, N.L. tried to think of some way for somebody to be able to track him down, and seeing his license plate, she continued to scream out his license plate to herself so that she could remember it. N.L. ran to the nearest house and knocked at doors until the Lopez

8

family answered. N.L. testified that a man opened the door at the Lopez home, and she told him, "I've been raped. Please help me." The man and his wife brought N.L. inside and called 911.

### D. The Extraneous-Offense Evidence

Before the State rested its case-in-chief, it informed the trial court that it intended to introduce evidence that Appellant committed a very similar offense against a woman named Miriam Torres. The State asserted that the evidence of the similar extraneous offense was admissible to rebut an accusation of fabrication. The State asserted that in its opening statement and during cross-examination, the defense had "clearly and repeatedly accused the victim of fabricating her sexual assault to avoid getting in trouble." Appellant objected that such evidence was inadmissible because the extraneous act had no relevance aside from character conformity, it was different than the charged offense against N.L., and its probative value outweighed its prejudicial effect. Additionally, Appellant objected that the incident reported by Miriam Torres involved a subsequent act as it allegedly occurred much later than the date of the alleged incident involving N.L. Appellant argued that, because the case involving Miriam Torres remained pending, the defense would not have sufficient time to prepare for a "pretrial on a pending charge." After allowing both parties to examine the extraneous-offense witness outside the jury's presence, the trial court ruled that the testimony was admissible.

Miriam Torres testified as the last of the State's eight witnesses who appeared in the guilt-phase of trial, and aside from the custodian of 911 records who briefly testified to the authenticity of the records of the call made by Torres, no other witnesses testified in connection with the State's evidence of other crimes or acts. The trial testimony related to the offense alleged by Torres took up 24 pages of a multi-volume reporter's record in which well over 400 pages were transcribed for

9

the entirety of the guilt-phase of trial.

Torres, who was then 23-year's old, testified that more than 15 months earlier, on December 17, 2016, she was staying at her mother's house, by herself, during her pregnancy with her second child, when, at about 10 p.m., she saw a white car pull into her driveway and then heard knocking at her front door. Although she did not see who was at the door and she had thought it was the father of the child with whom she was pregnant, she opened the door only to see Appellant standing there. Torres testified she had never seen Appellant before.

Appellant kicked the door open, walked toward her while holding "a blade," and strangled her with his other hand until she lost consciousness. When she awoke, she found she was in her sister's bed and Appellant was telling her to take off her clothes. She complied, she said, "[b]ecause of the fear, the terror, yeah." Appellant remained in front of her with "a blade." He then raped her. When Torres tried to resist, Appellant strangled her until she once again lost consciousness. When she woke up this second time, Appellant told her to go from the bed to the sofa in the living room, and still holding his knife, Appellant followed her. Torres had photographs of her family in the living room and had earlier pleaded with Appellant not to kill her because she had a son. Once in the living room, Appellant told her that he would kill her son if she said anything. He eventually strangled her a third time because she had looked at him after he told her not to do so, and she passed out once again. Torres woke up in the bathroom where Appellant wiped her genitals and neck with soap and water. He then took Torres's wallet, which contained her food stamp card, money, and other items, her jewelry, and her two cell phones. He also told Torres that he would send her to become a prostitute if she told anyone about what he had done, and he threatened to hurt her family. Once she was able, Torres called 911. Along with her

10

testimony, the trial court admitted her 911 call and its corresponding computer-aided-dispatch record into evidence.

## II. DISCUSSION

### A. Issue One: Admission of Extraneous-Offense Evidence

In his first issue, Appellant argues that the extraneous-offense evidence involving an alleged sexual assault committed against Miriam Torres—an adult complainant—was not admissible for the following reasons: (1) that his defense "was aimed at challenging the credibility and accuracy of the prosecution's witnesses," and any assertion of fabrication on his part played "such a minimal role" that the trial court could not have found that he expressly raised a fabrication theory such that it rendered the extraneous-offense evidence admissible as rebuttal evidence; (2) that the extraneous-offense evidence lacked sufficient similarity to the charged offenses to be admissible; and (3) that the probative value of the extraneous-offense evidence was substantially outweighed by the unfair prejudice as established by the countervailing factors considered under Texas Rule of Evidence 403. In response, the State argues that: (1) Appellant did more than merely challenge the credibility of the complaining witness in expressly presenting a defensive theory of fabrication, and thus, he opened the door for the admission of the extraneous-offense evidence as rebuttal evidence; (2) evidence of Appellant's sexual assault of Miriam Torres was sufficiently similar to be relevant in rebutting the fabrication theory; and (3) Appellant failed to show that the admission of the extraneous-offense evidence was unfairly prejudicial. Finding no error, we overrule Appellant's issue.

#### 1. Underlying Facts

##### a) The Defensive Theory

11

During his opening statement, Appellant's counsel argued that the improbability of N.L.'s allegations showed that "she was making up a lie" as "some sort of excuse" to deflect attention from her own actions on the night she met Appellant:

> I assume we have all had sex, and we know [how N.L. described it is] not how it works. The improbability of her statement shows that she was making up a lie. A desperate young girl, who found herself alone on the street after having snuck out at about 1:00 or 2:00 a.m., and now she needs to come up with some sort of crisis, some sort of excuse, to put the attention away from her own actions into the actions of somebody else.

> She was thoroughly examined medically, and not one wit of forensic evidence shows that she was sexually abused that evening.

> When you hear about the rape of a child, we are all taken aback. But I think that common human experience knows that sometimes kids make stuff up and call it their own activity.

In his first question for N.L. on cross-examination, defense counsel asked whether she, feeling "angry," "afraid," and "rejected" by Appellant, alleged that Appellant raped her "as an excuse" for her own behavior that night:

> What I think happened is when [Appellant] told you to leave his car and drove away and left you there at Vista Hills [S]chool parking lot, you found yourself in a very difficult situation. You were angry. You were afraid. You were rejected. You knew you were in trouble because you left your house. . . . You certainly went to a neighbor and said that you were raped as an excuse.

> Is that what happened?

Only six questions later, counsel asked, "Did you make up this story to cover up for your own action that night?" Attempting to further develop this theory, counsel later asked on cross-examination whether N.L. was the one who suggested that the two go to her brother's school because she knew where it was, and whether she had dressed in a "provocative" outfit for Appellant.

12

### b) The Limiting Instructions

Immediately before Torres took the stand, the trial court instructed the jury that it could not consider the forthcoming evidence about other crimes, wrongs, or acts by Appellant for any purpose unless it believed beyond a reasonable doubt that he committed those acts. And, in addition, pursuant to a limiting instruction requested by the State, the jury charge itself also instructed the jury not to consider the extraneous-offense evidence unless it found that it was proven beyond a reasonable doubt. The charge instructed that, even if proven, the evidence could be considered only "to rebut the defensive theory of fabrication . . . and for no other purpose."

### c) Standard of Review

We review the trial court's admission of extraneous-offense evidence for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We will affirm a trial court's ruling so long as it is within the zone of reasonable disagreement. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

## 2. Sub-Issue One: Fabrication Defense

### a) Applicable Law

Rule 404(b)(1) of the Texas Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). But even still, Rule 404(b)(2) clarifies that such evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). Thus, Rule 404(b)(2) allows evidence of other crimes, wrongs or acts, "if the evidence has relevance apart from character conformity." *Moses v. State*,

13

105 S.W.3d 622, 626 (Tex. Crim. App. 2003). A defense opening statement can open the door to the admission of extraneous-offense evidence to rebut a defensive theory presented during such statement. *See Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016); *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). Similarly, a defensive theory may also be raised in other ways, such as through voir dire or by means of the cross-examination of witnesses. *See Dabney*, 492 S.W.3d at 318 (voir dire); *Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001) (cross-examination).

The State's rebuttal of a defensive theory is recognized as one of the permissible purposes for which extraneous evidence may be admitted under Rule 404(b)(2). *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). For example, an assertion that the complaining witness has fabricated the charged offense has been recognized as a defense theory for which the State may offer rebuttable evidence on the logic that the extraneous-offense evidence "made these defensive theories less probable." *Bass*, 270 S.W.3d at 563. Thus, an assertion of fabrication is a defensive theory that can open the door to extraneous-offense evidence. *See, e.g., Dennis v. State*, 178 S.W.3d 172, 178 (Tex. App. – Houston [1st Dist.] 2005, pet. ref'd); *Jones v. State*, No. 10-13-00006-CR, 2013 WL 5494678, at *2 (Tex. App. – Waco Sep. 26, 2013, pet. ref'd) (mem. op., not designated for publication).

### b) Application

While acknowledging that "[f]abrication has been recognized as a rebuttable theory," Appellant nevertheless asserts that a court's determination that such a theory was raised depends on "how intense and specific the defense is." Appellant asserts that fabrication has a technical meaning centered on intensity and specificity. He argues that "[d]enying an offense occurred and

14

attacking the complainant's credibility–calling the complainant a liar, in other words–is certainly a claim of 'fabrication' in the everyday sense," but such challenges ordinarily occur at trial without developing into the notion of a frame-up or assertion of fabrication. On review, however, we believe the record here reflects more than a basic credibility challenge implicating the State's evidentiary burden to prove its case beyond a reasonable doubt, and, instead, reflects an assertion of a defensive theory which offered the jury an alternative narrative to explain why the victim had conjured up the allegations.

In his opening statement, Appellant provided a roadmap to the jury in which his theory of the case urged it to consider his alternative narrative, namely, his assertion that 14-year-old N.L. "was making up a lie" as "some sort of excuse" to deflect attention from her own actions of sneaking out of her home, and urging that "common human experience knows that sometimes kids make stuff up[.]" While Appellant never used the word "fabrication" in this portion of his opening statement, nonetheless, his construction of an alternative narrative urging the jury to believe that N.L. made up an allegation to protect herself from discipline went beyond anything resembling a mere challenge to the State's burden of proving the offense beyond a reasonable doubt or otherwise arguing about why N.L.'s lack of credibility would prevent the State from meeting such evidentiary burden. At the very least, we think that reasonable minds could differ as to whether Appellant's opening raised a defensive theory of fabrication, and we hold that the trial court did not abuse its discretion by so ruling. *See Bass*, 270 S.W.3d at 557-58, 563 (holding that it was at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible to rebut defensive theories raised in the defendant's opening statement where: (1) defense counsel claimed that the complainant's allegations were "pure fantasy" and "pure fabrication"; and (2)

15

where counsel clearly suggested that appellant, as a "real deal" and "genuine" pastor, would not engage in the type of conduct alleged in the indictment); *Jones*, 2013 WL 5494678, at \*4-5 (rejecting defendant's claim that he did not present a fabrication defense and holding that it was at least within the zone of reasonable disagreement that the defendant opened the door to admission of extraneous-offense evidence through a fabrication-defense theory where, by asserting during opening statement that the victim changed her story and that the victim's outcry occurred during a custody battle, the defendant implied that the victim fabricated her story).

Even if we were to assume that Appellant's opening statement alone did not raise a fabrication theory, nonetheless, his opening salvo of questions during cross-examination reflected his intention to develop a precise defense of fabrication when he asked N.L. if she "said that [she] [was] raped as an excuse," and if she "[made] up this story to cover up for [her] own action that night[.]" *See Dennis*, 178 S.W.3d at 178 (holding that the defendant raised a fabrication defense where defense counsel stated during opening statement that the victim fabricated the sexual assault allegations against her father because she was angry at him for disciplining her over poor grades and further pursued that theory during cross-examination).

Appellant argues that his defense mirrors that which was discussed in *Pavlacka v. State*, 892 S.W.2d 897, 901 (Tex. Crim. App. 1994), where the Court of Criminal Appeals held that the extraneous-offense evidence at issue was not relevant to rebut any defensive theory. Appellant asserts that his "rationale for the allegations–that the complainant was lying to keep herself out of trouble–was exactly the same in *Pavlacka*." However, we find *Pavlacka* distinguishable from the record here for the same reasons the Houston First Court of Appeals articulated in *Dennis*: "In *Pavlacka*, the defendant did not raise the defense that the complainant had fabricated testimony as

16

a result of improper influence or motive, and 'the State, as proponent of the evidence, suggested no theory of logical relevance *other than character conformity*.'" *Dennis*, 178 S.W.3d at 178 (quoting *Pavlacka*, 892 S.W.2d at 901-02) (emphasis added). Like in *Dennis*, the State here sought to admit the extraneous-offense evidence involving Miriam Torres for the permissible purpose of rebutting Appellant's defense that N.L. fabricated the sexual assault allegations to avoid discipline by her family – rather than under a character-conformity theory alone, as apparently occurred in *Pavlacka*.

For the above reasons, we overrule Appellant's first sub-issue in which he contended that he had not asserted a theory of fabrication.

### 3. Sub-Issue Two: Similarity of Charged Offense and Extraneous Offense

#### a) Applicable Law

An extraneous offense may be admissible to rebut a defensive theory asserting that complainant's allegations of being molested were "pure fabrication" or "pure fantasy." *See Bass*, 270 S.W.3d at 557, 563; *Wheeler v. State*, 67 S.W.3d 879, 887 n.22 (Tex. Crim. App. 2002); *Rotz v. State*, No. 08-08-00203-CR, 2010 WL 1076270, at *5 (Tex. App. – El Paso Mar. 24, 2010, pet. ref'd) (not designated for publication) (finding that the extraneous offense and the charged offense were sufficiently similar to support admissibility of the extraneous offense). In *Wheeler*, the Court of Criminal Appeals held that admission of extraneous-offense testimony was relevant to rebut two defensive theories asserted by defendant: (1) lack of opportunity or impossibility; and (2) a "frame-up" by the victim's family. *Wheeler*, 67 S.W.3d at 886-87. In holding that the evidence was admissible to rebut the so-called "frame-up" theory, the Court observed that the extraneous-offense victim's testimony "further served to contradict appellant's 'frame-up' theory by showing

17

appellant's prior misconduct (very similar to that for which he was charged in the present case) in circumstances involving neither money nor revenge as possible motives." *Id*. at 887. In a footnote, the Court further fleshed out its reasoning as set forth below in its entirety:

> An extraneous offense may be admissible to rebut the defense in a child sexual assault case that the defendant is the innocent victim of a "frame-up" by the complainant or others. In *such a situation*, the extraneous misconduct must be at least similar to the charged one and an instance in which the "frame-up" motive does not apply.

*Id*. at 887 n.22 (citations omitted) (emphasis added).

Both parties in this appeal identify—as a stand-alone requisite for admission of extraneous-offense evidence—that the charged offense and the extraneous offense be "similar" pursuant to this language in *Wheeler,* which we later quoted in *Rotz* by providing that, "the extraneous misconduct must be at least similar to the charged one and an instance in which the 'frame-up' motive does not apply." *See Wheeler*, 67 S.W.3d at 887 n.22; *Rotz*, 2010 WL 1076270, at *4. Like in *Rotz*, this *Wheeler* language was also carried over into a stand-alone admissibility requirement by the Houston court of appeals as well. *See, e.g., Dennis*, 178 S.W.3d at 178. Although some similarity is required when extraneous evidence is offered to rebut a fabrication theory, the requisite degree of similarity is not as exacting as necessary when it is offered to prove identity by showing the defendant's "system" or modus operandi. *Rotz*, 2010 WL 1076270, at *4; *see also Dennis*, 178 S.W.3d at 179. The degree of similarity required to rebut a defensive issue is not great. *Rotz*, 2010 WL 1076270, at *4; *see also Dennis*, 178 S.W.3d at 178-79.

### b) Application

Appellant asserts that the "what" and "where" differences between the two acts make them materially distinctive under this analysis. He also asserts that we should find the offenses too

dissimilar because the testimony from Torres depicted "a progression of crimes distinct from and far more serious than the case being tried, including (at minimum) burglary of a habitation with intent to commit a felony, aggravated sexual assault, aggravated robbery, obstruction, tampering with evidence, and unauthorized use of food stamp benefits at a later time." However, we perceive these arguments as an attempt to raise the State's burden beyond what is necessary for admission of extraneous-offense evidence offered to rebut a defensive theory. We decline to raise this burden in light of our precedent establishing that a showing of "some similarity" will suffice to meet the evidentiary burden. *See Rotz*, 2010 WL 1076270, at \*4; *see also Dennis*, 178 S.W.3d at 179.

In the instant case, we hold that testimony of Appellant's sexual assault of Torres was sufficiently similar to the charged offense involving N.L. to make the evidence admissible to rebut Appellant's fabrication theory. In both instances, Appellant attacked the victims late at night, threatened to involve their families in order to gain the victims' compliance, threatened both victims with violence if they resisted, and took their cell phones after he had committed a sexual assault. And in what is perhaps the most striking similarity, Appellant not only strangled both victims during his assaults, but also, in his video-recorded interview, he himself mentioned that he would strangle a victim if he were to "rape a chick."

Thus, it was at least within the zone of reasonable disagreement for the trial court to hold that Appellant's two offenses were sufficiently similar for the extraneous-offense evidence to be relevant in rebutting a defensive theory of fabrication. *See Banks v. State*, 494 S.W.3d 883, 893 (Tex. App. – Houston [14th Dist.] 2016, pet. ref'd) (holding that the charged and extraneous offenses were sufficiently similar where both: (1) involved young females; (2) occurred while the defendant was an adult; and (3) involved sexual contact between the defendant and complainants);

19

*King v. State*, No. 12-07-00433-CR, 2010 WL 1510204, at *5-6 (Tex. App. – Tyler Apr. 16, 2010, pet. ref'd) (mem. op., not designated for publication) (holding that the extraneous offense was sufficiently similar to the charged offense to make it admissible to rebut the defensive theory of accident by showing the defendant's intent where, even though the two incidents "involved different firearms, different provocations, and different participants," they shared the sole similarity of showing that the defendant acted intentionally to shoot another person). We therefore overrule this second sub-issue asserting lack of similarity.

### 4. Sub-Issue Three: Rule 403 Analysis

#### a) Applicable Law

Texas Rule of Evidence 403 provides that a court may exclude relevant evidence if its probative value is substantially outweighed by the danger of multiple countervailing factors. TEX. R. EVID. 403. A Rule 403 balancing test includes the following factors: (1) the probative force of the evidence, coupled with (2) the proponent's need for that evidence, balanced against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *Carrillo v. State*, No. 08-14-00174-CR, 2016 WL 4447611, at *4 (Tex. App. – El Paso Aug. 24, 2016, no pet.) (not designated for publication).

We reverse a trial court's balancing determination "rarely and only after a clear abuse of discretion." *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990); *Carrillo*, 2016

WL 4447611, at *4. Relevant evidence may be excluded under Rule 403 only if its probative value is substantially outweighed by the danger of unfair prejudice. *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009). Under Rule 403, it is presumed that the probative value of relevant evidence outweighs any danger of unfair prejudice. *Id*. "The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Id*. Because Rule 403 permits the exclusion of admittedly probative evidence, "it is a remedy that should be used sparingly, especially in 'he said, she said' sexual-molestation cases that must be resolved solely on the basis of the testimony of the complainant and the defendant." *Id.*; *Carrillo*, 2016 WL 4447611, at *4.

### b) Application

#### i. Probative Value and Need

As discussed above, Appellant raised a defensive theory of fabrication, and the State argued that the extraneous-offense evidence became relevant to rebut this theory. The high degree of similarity between the two offenses made Torres's testimony highly probative to show the jury that N.L. was not simply conjuring up the details of her allegations against Appellant. Furthermore, the State's need for the extraneous-offense evidence was more so increased where there were no eyewitnesses to a sexual assault committed against a young, 14-year-old girl and where the forensic assault examination revealed some evidence of injuries to parts of her body but not to her private areas. *See Newton v. State*, 301 S.W.3d 315, 320 (Tex. App. – Waco 2009, pet. ref'd) (in a case involving a sexual crime committed against a child, holding that the State's need for evidence was "considerable" where there were no independent eyewitnesses and no physical evidence available to corroborate the complainant's testimony). Therefore, we hold that these two factors

21

weigh heavily in favor of admission.

### ii. Unfair Prejudice

Only "unfair" prejudice provides a basis for exclusion of relevant evidence. *Montgomery*, 810 S.W.2d at 389. Unfair prejudice arises from evidence that has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one. *Id*. However, a trial court's proper limiting instruction regarding the use to which the jury must put the extraneous offense lessens any possible prejudicial impact of the evidence. *See Banks*, 494 S.W.3d at 894; *see also Blackwell v. State*, 193 S.W.3d 1, 15 (Tex. App. – Houston [1st Dist.] 2006, pet. ref'd) (the trial court's jury instructions are a factor to be considered in determining the potential to impress the jury in an irrational but indelible way).

Here, the jury charge instructed the jury that the extraneous-offense evidence, if proven by the State beyond a reasonable doubt, could be considered only "to rebut the defensive theory of fabrication . . . and for no other purpose." The court also provided an oral instruction immediately before Torres's testimony instructing the jury that it could not consider the extraneous-offense evidence unless it believed beyond a reasonable doubt that Appellant committed it. These instructions repeatedly directed the jury to not simply accept Torres's testimony as true and required the jury to limit its use of the evidence to a narrowly-circumscribed purpose. Thus, these limiting instructions lessened any possible prejudicial impact here. *See Banks*, 494 S.W.3d at 894; *see also Blackwell*, 193 S.W.3d at 15.

In a similar vein to his argument in the second sub-issue above, Appellant asserts that one of the defining features of our Rule 403 analysis should be "[t]he fact that the [extraneous-offense evidence] involved numerous crimes, almost all of which were more reprehensible than the charge

22

being tried[.]" Responding specifically to this point, the State questioned how Torres's sexual assault could be deemed "more reprehensible" than the sexual assault of a 14-year-old girl. Without weighing in on whether one assault is more heinous over another, we believe the standard of review simply dictates that the trial court's decision must fall within the zone of reasonable disagreement. *See Prible*, 175 S.W.3d at 731. And we believe the trial court's decision here fell within this wide range of discretion within which reasonable minds could differ. Ultimately, we hold that this factor weighs slightly in favor of admission where the trial court could have reasonably determined that Appellant's sexual assault of Torres was no more reprehensible than his sexual assault of N.L., and where the trial court gave proper limiting instructions to reign in any untoward prejudice that could have arisen from the extraneous offense evidence itself.

### iii. Confusion of Issues

Out of the State's eight witnesses, Torres was the sole witness to provide direct evidence of Appellant's sexual assault against her. Although a 911 custodian also testified to authenticate the admission of Torres's 911 call, the custodian's testimony was brought for that sole purpose and was rather brief. Furthermore, the extraneous-offense evidence was short compared to the State's evidence on the charged offenses. And as discussed above, the extraneous-offense evidence bore great relevance for the direct purpose of rebutting Appellant's fabrication defense. We hold that this factor, too, weighs in favor of admission based on the State's narrow presentation and narrow emphasis on the extraneous-offense evidence. *See Carrillo*, 2016 WL 4447611, at \*5-6 (holding that presentation of the extraneous-offense witness's testimony did not misdirect the jury from the charged counts where the witness was the only person who provided testimony about the extraneous offense involving her and where, in the context of the entire case, the State's primary

23

argument had more to do with evidence relating to the charged offenses); *see also Banks*, 494 S.W.3d at 894 (holding that this factor weighed in favor of admission where the extraneous-offense evidence was limited, direct, and relevant).

### iv. Undue Weight and Needless Presentation of Cumulative Evidence

The undue-weight factor pertains to evidence which, for reasons other than emotion, might mislead a jury. *Carrillo*, 2016 WL 4447611, at *6. The Court of Criminal Appeals gives the example of "'scientific' evidence [that] might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641.

Here, Torres's testimony about Appellant's sexual assault was straightforward, and there was nothing about her testimony that would complicate the jury's understanding of her ordeal. *See Banks*, 494 S.W.3d at 894 (holding that this factor weighed in favor of admission where the extraneous-offense evidence was straightforward and easily understood by the jury). In addition, the brevity of the extraneous-offense evidence in comparison to the State's development of evidence on the charged offenses – whether measured by number of witnesses or number of pages in the reporter's record – underscores the fact that the evidence was neither needless or cumulative. *See Lane v. State*, 933 S.W.3d 504, 520 (Tex. Crim. App. 1996) (holding that the extraneous-offense evidence was not unduly lengthy where it constituted less than one-fifth of the testimony in the State's case-in-chief); *Womack v. State*, No. 08-99-00430-CR, 2001 WL 1383179, at *5 (Tex. App. – El Paso Nov. 8, 2001, no pet.) (not designated for publication) (holding that the complained-of evidence did not consume an inordinate amount of time where it accounted for twenty pages out of a seven-volume record). For these reasons, we hold that this factor weighs in favor of admission, as well.

### v. Conclusion

All six factors in the Rule 403 balancing test weigh in favor of admission here. Thus, the trial court was certainly within its discretion to find that the probative value of the extraneous-offense evidence regarding Appellant's sexual assault of Torres was not outweighed by the countervailing Rule 403 factors. We overrule this third sub-issue in Appellant's first issue presented for review, and having overruled all three of his sub-issues, we overrule his first issue in its entirety without any finding of error.

### B. Issue Two: Denial of Cross-examination

In his second issue, Appellant argues that the trial court violated his constitutional right to cross-examine Miriam Torres regarding a "prior illicit relationship," which he alleged had existed between the two of them, and that a full opportunity to cross-examine her on this topic "may have suggested potential biases or motivations to testify in the way she did." In response, the State asserts a three-part argument. First, that Appellant waived his complaint by failing to object to the trial court's alleged limitation of his cross-examination. Second, even if his complaint had been preserved, the State argues that Appellant himself abandoned further inquiry of the allegedly excluded subject matter, which the State further asserts would have only marginally advanced his defensive theory, and Appellant failed to show that the trial court committed error, let alone constitutional error. And, finally, the State argues that error, if any, was harmless. Finding that Appellant failed to preserve his complaint for our review, we overrule Issue Two.

### 1. Underlying Facts

During the voir dire hearing held outside the presence of the jury, Appellant's counsel asked Torres whether she had ever advertised "[her] services as a dominatrix? That is a person

25

who provides sexual domination acts[.]" Torres responded, "No." Appellant's counsel followed up with two additional questions, asking more narrowly, whether she had advertised such service either on "Craig's list" or "Back Page." Torres responded "No" to both questions. Counsel then asked several questions about Torres having testified on direct that Appellant had taken two different cell phones from her along with her wallet. Torres responded that one phone was given as a gift from the father of her son. Although he was only 2-years' old, she said the phone included games and her son would use it to speak to his father. Counsel next asked for the name of the child's father. Torres responded that she was not going to give his name. Defense counsel stated, "Would the Court please?" The trial court responded by inquiring how the father's name was relevant to the proceeding. Defense counsel responded that the father's name was relevant to Torres's claim against Appellant, that he could issue a subpoena to the phone's service provider under the name and "find out if this young lady was using that telephone to work as an escort and thus impeach her." The trial court responded with "Let's move on." Defense counsel responded "Okay," then he asked: "Now, how were you employed at the time?" Torres responded that she was pregnant and not working. No other comment was made by counsel on these topics nor were any objections asserted.

Later, during Appellant's cross-examination in front of the jury, Appellant's counsel asked Torres why she used the word "escort" in her 911 call. She responded that Appellant had threatened her that if she said anything he would "set me like a prostitute." When Appellant followed with a question asking whether she was working as an escort, she answered "No." While Appellant was in the midst of asking his next question, the trial court interrupted, ordered the jury to disregard Torres's last two answers, and excused the jury from the courtroom. The trial court

26

then asked defense counsel if his line of questioning was going to be based on Torres's 911 call. Defense counsel responded, "[t]he question that I want to ask is: Who told her she was going to be put to work as an escort?" The trial court told counsel that he could "ask it as a question, because you are making it as a statement" but to "be careful of your words on the question, and then you need to move on." Defense counsel informed the court that he had a good faith basis for asking Torres about whether she had a prior relationship with Appellant, and the trial court told defense counsel that it would be willing to revisit any line of questioning about such a relationship but that counsel should limit any questioning to the 911 call for the time being. Defense counsel did not lodge any objection, and once the jury returned to the courtroom, he pursued a different line of questioning.

During a subsequent voir dire outside the presence of the jury, defense counsel showed Torres a photograph marked as Defendant's Exhibit 6 which was later represented by counsel as depicting an advertisement for an escort. Counsel asked Torres whether she was depicted in the photograph. She responded "No." When the trial court instructed defense counsel "not to go into that," counsel replied, "Yes, Your Honor." Once the jury returned to the courtroom, Torres completed her testimony and was excused from the proceeding subject to recall.

Once the jury exited the courtroom for a short break, defense counsel informed the trial court that he had just sent a request to his investigator asking him to look for any evidence establishing that the photograph in question could be linked to Torres. After the court requested a response from the State, the prosecutor responded that the photograph was not relevant, that Torres had testified that she was not depicted in it, that the image did not look like Torres, that it indicated on its face that the person depicted was 27-years' old and lived in a different part of the city as

27

Torres, and that a date shown on it indicated it was taken after the incident at issue. In response, Appellant's counsel argued that the photograph was "[r]elevant, because I can impeach her on her direct answers to my question of whether or not she is an escort. And that means that I can argue that the rest of her testimony is thus false when I have to argue about other crimes, evidence to the jury." The trial court instructed that counsel would be permitted to call his investigator for testimony once he had some time to look into the matter. In the meantime, the trial would proceed with other witnesses. The court then asked if Appellant wanted to recess for the day so that he could have time to reassess his strategy based on the fruits of whatever turned up from the investigation, and when counsel responded that he wanted to do so, the court recessed the trial for the remainder of the day.

At the beginning of the next day of trial, defense counsel informed the trial court that he did not intend to recall Torres to testify because, based on counsel's diligent investigation, counsel had confirmed that the photograph retrieved from the advertisement was not of Torres.

## 2. Whether the Trial Court Disallowed Any Line of Questioning

Before we can address whether this issue was preserved for our review, we must address the State's argument that there is no action by the trial court for Appellant to complain about because "the record shows that it was [Appellant] himself, not the trial court, who ultimately decided not to pursue his 'prostitution theory.'" Looking to the only instances where the trial court addressed Appellant's line of questioning on this theory, we fail to see any limitations on his ability to cross-examine Torres regarding this theory.

During the first instance, Appellant asked Torres for the name of her father's child. She responded that she was not going to give him the name. As counsel requested assistance from the

court, the judge asked for relevancy. Counsel responded it was relevant to know the name because he could subpoena phone records under the name and find out whether Torres worked as an escort and thus impeach her. The trial court then instructed defense counsel to move on. Because this circumstance transpired during a voir dire hearing held outside the presence of the jury, we fail to see how the trial court's exercise of its control over the voir dire hearing limited Appellant's ability to present his escort theory in front of the jury.

Regarding the second instance, Appellant was in the middle of a line of questioning in which he asked Torres about whether she had used the word "escort" on her 911 call and had in fact been an escort. Torres answered that Appellant had threatened her that if she had said anything, he "would set me like a prostitute," and denied she worked as an escort. Interrupting the next question, the trial court called for a bench conference and informed counsel that these matters were taken up earlier "when we were talking." The court then announced that a break would be taken, indicated that the last two questions and answers were stricken from the record, and ordered the jury to disregard the testimony.

Outside the presence of the jury, the trial court asked counsel to clarify the question he wanted to ask and whether it was related to the 911 call. Appellant's counsel informed the court that the word "escort" was on the 911 call. The prosecutor confirmed this assertion but further added that Torres had said on the call: "She doesn't know who he is. There was a tracker. He said he was going to put her into escort and a bunch of things. She has no idea who he was." Appellant's counsel then clarified that the question he wanted to ask was: "Who told her she was going to be put to work as an escort?" The trial court then instructed for counsel to ask the question as a question without making it a statement. When the jury was brought back into the courtroom,

29

Appellant's counsel asked Torres who had put a tracker on her phone. Torres responded, "He was – he had threatened me that he was going to put a tracker on my phone."

In the third instance, Appellant had been questioning Torres outside of the jury's presence about whether a photograph of an escort advertisement had depicted her, when the trial court instructed defense counsel "not to go into that." However, the trial court later afforded defense counsel an evening recess to have his investigator search for any evidence that could substantiate his representation that the photograph in question in fact depicted Torres as an escort. And when trial resumed the next day, defense counsel informed the court, outside the presence of the jury, that it did not intend to revisit the line of questioning about the photograph because, after performing a diligent investigation, he had confirmed that Torres was not the young lady who was pictured on the escort web site.

In each of these instances that we could find in our review of the record, the trial court never conclusively disallowed Appellant's proposed line of inquiry about whether Torres worked as an escort, even though the court may have interjected somewhat into Appellant's questioning. Instead, Appellant appears to have voluntarily ceased his own line of cross-examination on the topic based on his own claim of a diligent investigation that revealed no evidence existed to support his line of inquiry. We thus hold that the trial court did not impose any limitation on Appellant's cross-examination and it thereby did not commit any actions that constituted error. *See Juarez v. State*, No. 04-15-00413-CR, 2016 WL 1359372, at *2 (Tex. App. – San Antonio Apr. 6, 2016, no pet.) (mem. op., not designated for publication) (overruling defendant's contention that the trial court prevented him from cross-examining a witness where the record demonstrated that the defendant voluntarily suspended cross-examining the witness and where the defendant did not

30

pursue a hearing outside the jury's presence to obtain a ruling on whether the trial court would permit his cross-examination of the witness on the desired topic he attempted to advance); *Weinstein v. State*, No. 08-01-00016-CR, 2003 WL 21198337, at *4 (Tex. App. – El Paso May 22, 2003, no pet.) (not designated for publication) (overruling defendant's argument that the trial court erred by curtailing his cross-examination of the State's primary witness and reasoning that the defendant failed to show on appeal what evidence was actually excluded where, in one incident, the trial court admonished defense counsel to stick to more "germane" matters and where counsel voluntarily ceased cross-examination on the desired topic of inquiry). Although we would overrule Appellant's second issue for this reason alone, we also overrule it on the basis that the issue has not been preserved for our review as we more fully discuss as follows.

### 3. Preservation

To preserve error for appellate review, the Texas Rules of Appellate Procedure require that the record show that the objection "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]" *See* TEX. R. APP. P. 33.1(a)(1)(A); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). The point of error on appeal must comport with the objection made at trial. *Clark*, 365 S.W.3d at 339; *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986).

To complain of a Confrontation Clause objection on appeal, a party must specifically object on that basis to the trial court's ruling disallowing the desired testimony on cross-examination. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000); *Nickerson v. State*, 478 S.W.3d 744, 760 (Tex. App. – Houston [1st Dist.]

2015, no pet.). The specificity requirement for error preservation is heightened when the defendant is asserting a constitutional point of error on appeal due to the stricter harm analysis that accompanies such complaints on appeal. *Clark*, 365 S.W.3d at 340.

In this case, Appellant never made any specific objection in the trial court that his constitutional rights under the Confrontation Clause were being violated, and in fact, he never made any objection at all during the instances in which the trial court interjected to address his line of questioning as to whether Torres worked as an escort. Therefore, we find that Appellant failed to preserve this issue for appellate review. *See Reyna*, 168 S.W.3d at 179-80 (arguments that evidence should be admitted for "credibility" and "to demonstrate that as to prior sexual activities, that [the victim] made allegations that there were prior sexual allegations, and recanted" were insufficient to preserve Confrontation Clause complaint for appeal); *Wright*, 28 S.W.3d at 536 (objections on hearsay and Rule 107 grounds did not preserve complaint under Confrontation Clause for appeal); *Nickerson*, 478 S.W.3d at 760 (relevance objection insufficient to preserve a Confrontation Clause challenge); *see also Govea v. State*, No. 08-99-00337-CR, 2000 WL 1713929, at *4 (Tex. App. – El Paso Nov. 16, 2000, pet. ref'd) (not designated for publication) (holding that defendant failed to preserve his Confrontation Clause complaint for appellate review where he failed to object on that basis in the trial court).

For this reason, as well, we overrule Appellant's second issue presented for review.[3]

### C. Issue Three: Denial of Jury Argument

---

[3]  Appellant argues that this issue is preserved because he "either explicitly explained the topic of the proposed cross-examination or it was entirely clear from the context" and because he "also explained why the questioning should be allowed[.]" However, this argument implicates the requisites for supplying an appropriate offer of proof from which an appellate court could determine whether particular evidence was improperly excluded. It does not address, in the first instance, whether a trial court was ever alerted to the need to consider a defendant's Confrontation Clause rights with a timely and specific objection. *See Reyna*, 168 S.W.3d at 176-79.

In his third issue, Appellant argues that the trial court committed reversible error in preventing him from arguing to the jury that the extraneous offense had not been proven beyond a reasonable doubt. He asserts that such argument was a proper summary of the evidence, a reasonable deduction from the evidence, and a response to the State's argument that it had sufficiently proven said extraneous offense. He contends that in so ruling, the trial court had impinged on his constitutional right to be heard by counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. He further asserts that the trial court's alleged commentary within its ruling about his argument being misleading compounded the error. In response, the State argues the following: (1) Appellant has failed to show that he was precluded from presenting his desired argument and thus has failed to show any error; and (2) even if the trial court erred in sustaining the State's objection to his argument, any error was harmless beyond a reasonable doubt. Finding that this issue was not properly preserved and that, in any case, there was no error, we overrule it.

### 1. Underlying Facts

During his closing argument, Appellant pointed to the absence of evidence corroborating Torres's testimony by noting that there was no video-recorded statement from Appellant, no police officer testimony, and no medical evidence in support of the allegation involving Torres. Aside from Torres's 911 call, Appellant noted to the jury that "[w]hat you have is a statement of one woman. That's all you have." Appellant discussed at length what he contended were the implausibilities and inconsistencies in Torres's 911 call. Appellant then argued why the State failed to prove the allegation involving Torres for the jury "to even consider Miriam Torres's testimony," up to the point that the State's objection to his argument was made and sustained:

| [Defense counsel]: | I want to read to you the law. This is what the jury instruction says: ["]You cannot consider such evidence for any purpose" |
|---|---|

33

|  |  |
|---|---|
|  | - - they are talking about Miriam Torres - - "unless you find and believe beyond a reasonable doubt that the defendant committed that offense." |
|  | So in order for you to even consider Miriam Torres's testimony, you have to find beyond a reasonable doubt that [Appellant] committed the offense that Miriam Torres told you about. |
|  | Well, were the phones recovered? You haven't heard anything. Was there a rape kit done? You haven't heard anything. Was there DNA evidence taken? You haven't heard anything. |
| [State]: | Your Honor, I'm going to object to misleading. |
| [Trial court]: | Sustained. |
| [Defense counsel]: | I'm sorry. What was the objection? |
| [Trial court]: | Sustained. It's misleading. You may talk about the evidence that was presented here, and you are limited to that evidence. Move on. |

The parties then approached the bench, and while there, Appellant lodged the following objection to the trial court's curtailment of his argument: "For the record, I object. I think I am entitled to go into the lack of any evidence presented to prove up the adjoining case against Miriam Torres." The trial court then noted this concern but did not change its ruling. Afterwards, Appellant continued to argue how a scrutinizing comparison of Torres's 911 call to her testimony would reveal why the State failed to prove her allegation beyond a reasonable doubt, and he asked the jury to "dismiss it, ignore it, go beyond it."

### 2. Standard of Review

We review the trial court's ruling on the State's objection to a defendant's jury argument for an abuse of discretion. *See Martin v. State*, 570 S.W.3d 426, 439 (Tex. App. – Eastland, pet.

ref'd), *cert. denied*, 140 S.Ct. 485 (2019); *Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App. –
Houston [1st Dist.] 2016, no pet.).

### 3. Preservation

The issue of whether a trial court improperly denied a defendant the right to make a closing
argument in violation of the constitutional right to counsel cannot be preserved for appellate review
where the record does not fully demonstrate to an appellate court what counsel would have argued
but for an objection. *Frias v. State*, No. 08-13-00325-CR, 2019 WL 101935, at *7 (Tex. App. – El
Paso Jan. 4, 2019, pet. ref'd) (not designated for publication); *Uyamadu v. State*, 359 S.W.3d 753,
767-68 (Tex. App. – Houston [14th Dist.] 2011, pet. ref'd); *Price v. State*, 870 S.W.2d 205, 209
(Tex. App. – Fort Worth), *aff'd*, 887 S.W.2d 949 (Tex. Crim. App. 1994).

Although defense counsel made an objection here and offered a thorough explanation of
why he believed that his argument was proper, counsel did not make a showing on the record of
what he would have argued but for the trial court's ruling. For this reason, this issue is not properly
preserved for appellate review. *See Frias*, 2019 WL 101935, at *7 (holding that defendant's issue
on appeal asserting that the trial court improperly curtailed his closing argument was not preserved
for review where his trial counsel did not make a bill of review or otherwise explain what he would
have argued but for the trial court's ruling); *see also Uyamadu*, 359 S.W.3d at 767-68; *Price*, 870
S.W.2d at 209. While this provides an independent basis for us to overrule Appellant's third issue,
we will proceed to address the merits of his claim in the interest of justice and overrule his issue
on that basis, as well.

### 4. Closing Argument

The trial court has broad discretion in controlling the scope of closing argument, but it may

not prevent defense counsel from making a point essential to the defense. *Vasquez*, 484 S.W.3d at 531; *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App. – El Paso 2004, no pet.). A defendant has a right to argue any theory supported by the evidence and may make all inferences from the evidence that are legal, fair, and legitimate. *Vasquez*, 484 S.W.3d at 531; *Lemos*, 130 S.W.3d at 892. Proper categories of jury argument include: (1) summations of the evidence; (2) reasonable inferences from the evidence; (3) answers to the arguments of opposing counsel; and (4) a plea for law enforcement. *Berry v. State*, 233 S.W.3d 847, 859 (Tex. Crim. App. 2007); *Frias*, 2019 WL 101935, at *8. Prohibiting defense counsel from making a particular jury argument when counsel is entitled to do so is a denial of the defendant's right to counsel. *Vasquez*, 484 S.W.3d at 531; *Lemos*, 130 S.W.3d at 892.

But there is no improper restriction on a defendant's jury argument amounting to a denial of counsel where the defendant is able to convey the gravamen of his argument to the jury despite the trial court's curtailment of a particular portion of his argument. *See Frias*, 2019 WL 101935, at *8 (where this Court held that, beyond the fact that the defendant's argument was outside the four categories of proper jury argument, the defendant "has not demonstrated that he was denied the right to assistance of counsel" because the record reflected the defendant was not "entirely precluded" from presenting his defensive theory at issue); *Martinez v. State*, No. 08-05-00116-CR, 2007 WL 416687, at *3 (Tex. App. – El Paso Feb. 8, 2007, pet. ref'd) (not designated for publication) (where this Court reasoned "we perceive no error" in the trial court's curtailment of the defendant's closing argument because, despite being prevented from directly arguing her desired factual assertion, the defendant was nonetheless "able to develop her defensive theory"); *see also Davis v. State*, 329 S.W.3d 798, 824-25 (Tex. Crim. App. 2010); *James v. State*, 660

36

S.W.2d 146, 148-49 (Tex. App. – Amarillo 1983, no pet.) (cases overruling on their merits the defendants' complaints asserting an improper denial of jury argument where the defendants were elsewhere in their closing allowed to make a similar argument urging the same substance as that of the allegedly curtailed arguments). The rationale behind this rule is that we view the entirety of counsel's argument to determine whether the trial court actually denied the right to present a defensive theory, and without a wholesale denial of the ability to argue such a theory, we cannot say that the trial court commits error amounting to a *denial of the right to counsel*.

Here, we fail to perceive any restriction on Appellant's jury argument that amounted to a complete denial of the right to counsel. Appellant argues in this appeal that he was prevented from demonstrating how the State had failed to prove the extraneous offense beyond a reasonable doubt. But before the State's objection was sustained, he had already pointed out that the State's proof of the extraneous offense rested solely on the testimony of one witness. He pointed to the absence of any of the evidence of similar type as seen in the indicted charge, – i.e., videos, police officer testimony, and medical testimony – and to the incredulous nature of Torres's 911 call. Appellant then directed the jury to the charge language explaining that the State must first prove the extraneous offense before it can even be considered, and he further pointed to the absence of additional items that the jury might have expected the State to be able to provide, such as "phones," a "rape kit," and any "DNA evidence." Even after the trial court sustained the State's objection, Appellant continued to argue how a scrutinizing comparison of Torres's 911 call to her testimony would reveal that the State had failed to prove her allegation beyond a reasonable doubt, and he asked the jury to "dismiss it, ignore it, go beyond it." Based on these comprehensive assertions about how the State may not have proven the extraneous offense beyond a reasonable doubt, we

37

hold that Appellant was able to convey the gravamen of his argument and that the trial court did not abuse its discretion in restricting the particular portion of his argument that it did. *See Frias*, 2019 WL 101935, at *8; *Martinez*, 2007 WL 416687, at *3; *see also Davis*, 329 S.W.3d at 824-25; *James*, 660 S.W.2d at 148-49. For this reason, we overrule Appellant's third issue presented for review, as well.[4]

### D. Cumulative-Error Analysis

In each of his issues presented for review, Appellant argues that we should consider any harm stemming from each of his individual issues in cumulation to determine whether he suffered harmful error from the combined actions of the trial court during his trial. However, there can be no cumulative-error effect unless and until multiple errors are found to have been committed because non-errors do not cumulate to create harmful error. *See Chamberlain v. State*, 998 S.W.2d

---

[4]   Even if we assumed that the trial court committed error here, we would find any error harmless due to Appellant's ability to convey the essence or gravamen of his argument to the jury despite the court's restriction. *See Martin*, 570 S.W.3d at 441-42; *Vasquez*, 484 S.W.3d at 532-33; *Rivas v. State*, No. 02-08-00410-CR, 2011 WL 856930, at *3 (Tex. App. – Fort Worth Mar. 9, 2011, no pet.) (mem. op., not designated for publication) (cases holding that the defendant's ability to convey the gravamen of his argument despite a trial court's restriction on the argument made any error harmless, rather than amounting to no error at all). Furthermore, we would find no harmful error under a cumulative-error analysis because there would be no separate harm with which we could accumulate the independently harmless error from this third issue of Appellant's appeal.

While graciously acknowledging that harmless error has generally been found when the same argument was otherwise conveyed, Appellant nevertheless asserts that any harm analysis should be controlled primarily by this Court's own prior decision in *Lemos* because the nature of the error here resembles the error we found there. In *Lemos*, we reversed the defendant's conviction for intoxication manslaughter after finding that the trial court's improper denial of his jury argument caused harmful error. *Lemos*, 130 S.W.3d at 889 & 893. Our threshold finding that the trial court committed error was based on two reasons: (1) the defendant's attempted closing argument that "his alcohol concentration increased from the time of arrest to the time of testing" was proper closing argument that invited the jury to draw reasonable inferences from the evidence; and (2) the State conceded error. *Id.* at 892. Our holding in the instant case, that there was no improper denial of the right to counsel amounting to error, is distinguishable from *Lemos*, and especially in light of the State's concession of error in that case. Furthermore, even if our holding here rested on a harm analysis, our holding in *Lemos* that the defendant suffered reversible error was based on the fact that the trial court entirely precluded the defendant from arguing "a central theory of the defense case," allowed the prosecutor to argue the exact opposite inference, and compounded the error by commenting in front of the jury that there was no evidence to support the defendant's argument while, at the same time, commenting that the State's converse inferential argument was "common sense." *Id.* at 893.

230, 238 (Tex. Crim. App. 1999); *see also Castruita v. State*, 584 S.W.3d 88, 114 (Tex. App. – El Paso 2018, pet. ref'd) (where this Court explained that "[i]f the individual claims of error lack merit, then there is no possibility of cumulative error."). And as we have held above that none of the disputed rulings of the trial court constituted error, we hold that Appellant's cumulative-error claim must also fail, and we overrule it.

## III. CERTIFICATE OF RIGHT TO APPEAL

We note that the trial court certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature indicating that he has been informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX. R. APP. P. 25.2(d). We thus find that the certification is defective and has not been corrected either by Appellant's attorney or by the trial court. To remedy this defect, the Court ORDERS Appellant's attorney, pursuant to TEX. R. APP. P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX. R. APP. P. 48.4, 68. Appellant's attorney is further ORDERED to comply with all the requirements of TEX. R. APP. P. 48.4.

## IV. CONCLUSION

Based on the foregoing reasons, the trial court's judgment is affirmed.


August 13, 2020                                        GINA M. PALAFOX, Justice

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)